<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

—————————————————————— :
JEANNETTE PLACE,                              :
                                              :
                        Plaintiff,            :        Civil Action No. 15-4084-BRM
                                              :
             v.                               :
                                              :
CAROLYN W. COLVIN, acting                     :
Commissioner of Social Security,              :        **OPINION**
                                              :
                        Defendant.            :
—————————————————————— :


**MARTINOTTI, DISTRICT JUDGE**

Before this Court is an appeal filed by Plaintiff Jeannette Place ("Plaintiff") from the final decision of the Acting Commissioner of Social Security, Carolyn W. Covlin ("Defendant"), denying Plaintiff's application for disability insurance benefits under Title II of the Social Security Act. After reviewing the Administrative Record, and for the reasons discussed below, the decision of the Administrative Law Judge ("ALJ") is **AFFIRMED**.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY
### A.      Procedural History

On November 15, 2011, Plaintiff filed an application for disability insurance benefits ("DIB"), under Title II of the Social Security Act (the "Act")[1], alleging disability beginning January 1, 2001 due to hip pain and dystonia (the "DIB Application"). (*See* Transcript ("Tr.") at 14, 117-24.) Plaintiff's DIB Application was initially denied on May 17, 2012. (Tr. 14, 70-72.)

---

[1] Title II of the Act appears in the United States Code as §§ 401-433, subchapter II, chapter 7, Title 42.

Reconsideration of Plaintiff's DIB application was also denied, on November 1, 2012. (Tr. 14, 76-78.) On December 13, 2012, pursuant to 20 C.F.R. § 404.929 *et seq*., Plaintiff filed a written request for a hearing before an ALJ. (Tr. 14, 79.)

On October 29, 2013, a hearing was held before ALJ Dennis O'Leary in Newark, New Jersey. (Tr. 14, 25-48.) Plaintiff, who was represented by counsel, John Forte, Esq., appeared and testified at the hearing. (*Id*.) In a decision dated January 14, 2014, the ALJ determined Plaintiff was not disabled. (Tr. 14-19.) Plaintiff requested the Appeals Council review the ALJ's decision. (Tr. 8.) On May 1, 2015, the Appeals Council denied Plaintiff's request for review. (Tr. 1-6.) Plaintiff then filed this civil action seeking judicial review of the ALJ's January 14, 2014 decision.

### B.      Factual Background

Plaintiff was born on July 17, 1960, and was 40 years old at the alleged onset of her disability. (Tr. 30.) Plaintiff has a Bachelor's degree. (*Id*.) She worked at Verizon for sixteen (16) years, until 1999 when she took an early retirement buyout package. (*Id*.) Plaintiff's last position at Verizon was executive director. (*Id*.) Based on Plaintiff's earnings records, she acquired sufficient quarters of coverage to remain insured through December 31, 2006 (the "date last insured"). (Tr. 14.)

Plaintiff's alleged disability results from a hip injury and dystonia, together with resulting pain in her hip, leg and lower back. (Tr. 17, 159.) In an April 18, 2012 Function Report, Plaintiff reported spending her day washing, dressing, making the bed, doing computer work, feeding the dog, making phone calls, doing physical therapy, grocery shopping, cooking dinner, reading, and watching TV. (Tr. 17, 169-73.) Plaintiff also reported caring for her elderly mother. (Tr. 17, 169.) At the hearing before the ALJ, however, Plaintiff testified she performs these tasks "slowly" due to pain. (Tr. 17, 38-41.) During the hearing, Plaintiff also testified her condition has progressively

2

worsened. (Tr. 17.) She conceded performing a wide range of daily activities and routine tasks like laundry and housework prior to her date last insured, but did so at a reduced level. (*Id*.) Plaintiff also stated she was able to drive, run errands, prepare meals for her sons, grocery shop, and otherwise function, but did so with pain and some difficulty. (*Id*.) Plaintiff also conceded her condition has severely worsened, to the point where she now takes heavy pain medication that she was not taking in 2006. (*Id*.)

### C.   Review of Medical Evidence From the Relevant Time Periods[2]
#### i.   1998-2001 Medical Evidence

Plaintiff began experiencing back and leg pain following a total colectomy in March 1998. (Tr. 830.) Plaintiff initially sought treatment for pain in her right hip and lower lumbar region at Kaiser Permanente in late 2000. (Tr. 463.) A November 2000 MRI of the lumbar spine revealed mild degenerative disc disease at L4-5 and a tiny central disc bulge at L5-S1. (*Id*.) Plaintiff was prescribed a nonsteroidal anti-inflammatory ("NSAID") and several pain agents. (*Id*.) A whole body scan was performed in March 2001, showing mild focal abnormalities from the right greater trochanter likely due to trochanteric bursitis. (*Id*.) Plaintiff's primary care physician also referred her for a neurological evaluation. (*Id*.)

Plaintiff saw David Lipps, M.D., for an initial neurology consultation on April 20, 2001. (Tr. 463.) Dr. Lipps' report, dated May 1, 2001, indicates that, since starting medication, Plaintiff's back and hip pain was largely resolved; she no longer had numbness or weakness in her right leg;

---

[2] As Plaintiff concedes, "to qualify for [Social Security disability benefits], one must be both disabled and insured for benefits. The last date that [Plaintiff] meets these requirements is . . . December 31, 2006. Therefore, to qualify for benefits her disability must have begun on, or before this date." (ECF No. 12 at n.1 (citations omitted).) In his decision, the ALJ likewise found Plaintiff's date last insured was December 31, 2006. (Tr. 14, 16.) As Plaintiff does not appeal this finding, the Court will only review the record for evidence of Plaintiff's medical condition on or before December 31, 2006.

and she had no difficulty walking. (*Id*.) On examination, Plaintiff had full lumbar range of motion; normal strength; negative straight leg raising test; normal gait and stance; intact sensation and reflexes; and no tremor, atrophy, or fasciculations. (Tr. 464.) Dr. Lipps' impression was Plaintiff had a history of right sciatica with right hip pain, noting imaging evidence of mild degenerative disc disease in the lumbar spine and radiologic evidence of trochanteric bursitis on the right. (*Id*.) However, Dr. Lipps also noted Plaintiff's symptoms were currently resolved and there was no evidence of radiculopathy, peripheral neuropathy, or myelopathy. (*Id*.) Dr. Lipps recommended Plaintiff follow-up with her primary care physician for further care. (*Id*.)

On July 9, 2001, Plaintiff was evaluated by Thomas Krisztinicz, M.D., an orthopedic surgeon, for pain and numbness in her right buttock, leg, and foot that she reported experiencing since 1997. (Tr. 451.) Dr. Krisztinicz assessed Plaintiff with sciatica and recommended an epidural steroid injection, which he administered on July 23, 2001. (Tr. 449-51.)

On August 29, 2001, Plaintiff was evaluated by Cathy Russo, M.D., a pain management specialist. (Tr. 443.) Dr. Russo's examination of Plaintiff was consistent with L5 radiculopathy and noted myofascial pain but no obvious trigger points. (Tr. 445.) Dr. Russo recommended Plaintiff continue with epidural steroid injections and prescribed Nortriptyline to assist with sleep. (*Id*.)

On October 17, 2001, Plaintiff began seeing a physical therapist, Kim H. Moy, for low back and right hip pain. (Tr. 437.) An examination revealed Plaintiff had a mild antalgic gait, pain at end range of flexion in the lumbar spine, pain in the bilateral hips with internal rotation, positive straight leg raising and Faber's sign on the right. (Tr. 438.) The examination also revealed Plaintiff had normal lumbar range of motion, 5/5 strength throughout, and intact sensation and reflexes. (Tr. 437-38.) Plaintiff was started on a physical therapy and home exercise program. (Tr. 438.)

4

Plaintiff continued to attend physical therapy on an intermittent basis through September 2003. (Tr. 339, 345, 349, 352, 359-64, 366, 373-76, 399-414, 435-36.)

On November 28, 2001, Plaintiff returned to Dr. Lipps for ongoing right hip and leg pain. (Tr. 432.) Dr. Lipps' examination revealed Plaintiff had pain with hip range of motion and tenderness over the region of the piriformis muscle, but noted full lumbar range of motion, negative straight leg raising test, normal strength in her upper and lower extremities, normal gait, and no neurological abnormalities. (Tr. 433.) Dr. Lipps assessed Plaintiff with right sciatica secondary to piriformis syndrome and referred her for a series of piriformis injections. (*Id.*)

Plaintiff underwent the piriformis injection on December 18, 2001, which provided partial relief, but caused some itching. (Tr. 430.)

### ii.     2002 Medical Evidence

Plaintiff returned to Dr. Lipps for a follow-up on February 5, 2002. (Tr. 427.) Plaintiff reported partial, but not 100%, relief from the piriformis injection and stated that chiropractic treatment and home exercise had helped significantly. (*Id.*) Plaintiff stated she continued to experience a pinching pain in her right hip and leg while sitting, but denied weakness or numbness in the legs, back or radicular pains. (*Id.*) Dr. Lipps' examination revealed normal gait, full back and hip range of motion, 5/5 strength bilaterally, and no evidence of atrophy. (*Id.*) Plaintiff was referred for an EMG to confirm the absence of damage to her sciatic nerve. (*Id.*) The results of the EMG were normal. (Tr. 425.)

On April 15, 2002, Plaintiff was evaluated by Dominique Vinh, M.D., an orthopedist, for further evaluation of her sciatica. (Tr. 419.) Dr. Vinh assessed Plaintiff with right greater trochanteric bursitis. After noting Plaintiff's chiropractor was "actually employing [physical therapy] techniques for strengthening," Dr. Vinh re-referred Plaintiff to physical therapy with

specific goals for her treatment. (Tr. 419-20.) Plaintiff experienced some relief with physical therapy. (Tr. 399-402, 411-14.)

On October 3, 2002, Plaintiff was evaluated by Sidney G. Chetta, M.D., an orthopedic surgeon, for right shoulder pain. (Tr. 394.) An examination revealed decreased range of motion in the neck with external rotation to less than 45 degrees bilaterally; tenderness to palpation at the sternoclavicular joint; acromioclavicular joint and clavicle; and mild instability. (*Id*.) Dr. Chetta discussed Plaintiff's right shoulder pain with her, noting that her "injury [was] certainly not violent" and ruled out rotator cuff, impingement syndrome, and instability with secondary impingement. (*Id*.)

### iii. 2003 Medical Evidence

Plaintiff returned to Dr. Vinh in February 2003 with complaints of ongoing tightness in her right piriformis muscle that was being treated with chiropractic intervention. (Tr. 387.) Dr. Vinh assessed Plaintiff with right piriformis spasm and pelvic floor weakness and prescribed Vioxx, a type of NSAID. (*Id*.) After a follow-up appointment in May 2003, Dr. Vinh added Neurontin to Plaintiff's medication regimen. (Tr. 370.)

Plaintiff presented to physical therapy on May 5, 2003, reporting 80%-90% improvement in her hip pain since receiving a right hip injection in April 2003. (Tr. 373.) Plaintiff reported walking more frequently, and was advised to slowly progress with her exercise program. (Tr. 374.)

On September 9, 2003, Plaintiff was seen by Leigh S. Boldt, M.D., a board certified internist, for fatigue that lasted all day and hair loss. (Tr. 346.) Dr. Boldt diagnosed generalized fatigue with hair loss, history of right hip/buttock pain radiating down the right leg status post injections of the piriformis region, and status post injections with corticosteroids. (Tr. 347-48.)

6

### iv.     2004 Medical Evidence

Plaintiff saw Dr. Vinh for a repeat examination in May 2004. (Tr. 319.) Dr. Vinh referred Plaintiff for radiographic imaging of her lumbar, thoracic, and cervical spine, which showed no more than minimal degenerative disc disease and mild central canal stenosis with ventral cord impingement at C4-5 and C5-6. (Tr. 315.) Plaintiff returned to Dr. Vinh on June 8, 2004. (*Id*.) Dr. Vinh diagnosed right piriformis spasms, pelvic floor weakness, and mild cervical cord impingement on MRI. (*Id*.) Dr. Vinh recommended repeat para-sciatic injections and physical therapy. (Tr. 315-16.)

On June 10, 2004, Plaintiff had a follow-up appointment with Dr. Lipps. (Tr. 314.) Plaintiff demonstrated full back range of motion, negative straight leg raising, 5/5 strength in her upper and lower extremities, and normal gait. (*Id*.) Dr. Lipps assessed Plaintiff with chronic sciatica and increased her dosage of Neurontin. (*Id*.) Plaintiff did not seek any further treatment for her sciatica until December 3, 2004, when she returned to Dr. Lipps reporting the increased Neurontin helped with the pain, but not the stiffness and aches in her right hip. (Tr. 303.) Plaintiff indicated she was doing cross-training daily, but her pain increased when performing these activities. (*Id*.) Dr. Lipps again increased Plaintiff's dose of Neurontin and also prescribed Flexeril to her medication regimen. (*Id*.)

### v.     2005 Medical Evidence

On February 23, 2005, Plaintiff was evaluated by Spencer Tseng, M.D., a physical medicine and rehabilitative specialist, for sciatica and groin pain that was aggravated by movement. (Tr. 295.) An examination revealed mild tenderness to palpation in the back, soft scars from prior surgeries in the abdomen with mild tenderness to palpation on the right, and tenderness to palpation of the gluteus region, greater trochanter, and inguinal region as well as adductors. (Tr.

296.) Dr. Tseng assessed Plaintiff with pain and advised her to continue her home exercise program. (*Id*.)

On May 27, 2005, Plaintiff saw rheumatologist Margaret Fisher, M.D., for chronic right hip/buttock pain. (Tr. 289.) Dr. Fisher's examination noted tenderness in Plaintiff's right buttock, greater trochanteric bursa, and the medial fat pad of the right knee. (Tr. 290.) Dr. Fisher assessed Plaintiff with myofascial leg pain, and recommended she try swimming and maximizing her dose of Neurontin. (*Id*.)

On November 3, 2005, Plaintiff saw Dr. Boldt for a follow-up for poor sleep secondary to pain in the right hip and buttock. (Tr. 287.) An examination revealed pulling and tightness with flexion at the right hip. (Tr. 288.)

On December 5, 2005, Plaintiff was evaluated by Greg Morgan, M.D., a neurologist, for insomnia. (Tr. 271.) Dr. Morgan diagnosed sleep-maintenance insomnia, likely caused by chronic right hip and leg pain, and prescribed Amitriptyline, an anti-depressant. (Tr. 272.)

### vi.    2006 Medical Evidence

On February 6, 2006, Plaintiff presented to John Ergener, M.D., an orthopedic surgeon, for back and right buttock/leg pain. (Tr. 259.) Plaintiff reported difficulty walking for more than ten (10) minutes and rated her pain as 6/10, which flared with activity. (*Id*.) On examination, Plaintiff had positive Faber's sign on the right, but normal gait, negative straight leg raising, intact sensation, and 5/5 strength. (*Id*.) Dr. Ergener assessed Plaintiff with sciatica. (*Id*.)

Plaintiff also returned to Dr. Lipps for a repeat evaluation in February 2006. (Tr. 256.) Plaintiff had a normal neurological examination without evidence of lumbar radiculopathy or neuropathy. (*Id*.) Dr. Lipps recommended that Plaintiff re-start chiropractic treatment. (*Id*.)

On May 24, 2006, Plaintiff was evaluated by Greg Fischer, M.D., due to persistent pain. (Tr. 239.) An examination revealed tenderness over the right greater trochanteric bursa and L5-S1 facet joints. (Tr. 240.) Dr. Fischer diagnosed lumbar spondylosis, and administered a right L5-S1 facet block, a right L4-5 facet block, and right greater trochanteric bursa injections. (Tr. 239-41.)

On June 9, 2006, Plaintiff was evaluated by pain management specialist Arthur Bergh, M.D. (Tr. 233.) An examination revealed tenderness over the right posterior superior iliac spine (PSIS) and mild tenderness in the left PSIS. (Tr. 234.) Dr. Bergh administered a right transforaminal epidural steroid injection. (*Id.*)

Plaintiff returned to Dr. Lipps on June 23, 2006, reporting increased pain and only partial relief from the epidural steroid injection. (Tr. 230-31.) An examination revealed tenderness to palpation in the right lumbar L4-5 facets and right hip piriformis pain with extension and hip rotation, and an antalgic gait on the right. (Tr. 231.) Dr. Lipps again increased Plaintiff's dose of Neurontin and continued Flexeril. (Tr. 230.)

On June 27, 2006, Dr. Bergh administered a right lumbar paravertebral facet joint block. (Tr. 226-28.) Plaintiff reported continued improvement with the injections. (*Id.*)

Shortly thereafter, Plaintiff moved to New Jersey and began treating with Michael Rudman, M.D., a pain management physician. (Tr. 830.) Plaintiff presented to Dr. Rudman on November 14, 2006, for back, buttock, and right leg pain. (*Id.*) During an initial evaluation, Plaintiff rated her sciatica and right hip/leg pain as 4-5/10 (mild-to-moderate pain), and demonstrated non-antalgic gait and no gross motor or sensory deficits. (Tr. 831.) Dr. Rudman assessed Plaintiff with right low back pain and right leg radicular symptoms, possibly consistent with nerve root irritation or compression. (*Id.*) Dr. Rudman prescribed a pool therapy regimen and referred Plaintiff for a repeat lumbar MRI. (*Id.*)

9

A December 2, 2006 MRI of Plaintiff's lumbar spine was normal except for minimal lumbar degenerative changes, very minimal bulging of the annulus fibroses at multiple levels, and facet joint hypertrophy. (Tr. 629-30, 831.) A follow-up examination with Dr. Rudman, on December 5, 2006, revealed tenderness of the midline bilaterally in the paraspinous muscles and decreased range of motion in flexion, but normal gait, full strength throughout, no neurological abnormalities, and full painless range of motion in her lower extremities. (Tr. 826-27.) Dr. Rudman diagnosed unspecified thoracic/lumbar neuritis/radiculitis, hypothyroidism, and osteoarthrosis, and prescribed Plaintiff Flexeril, Neurontin, and Skelaxin. (Tr. 827.) On December 7, 2006, Dr. Rudman administered a right L5 and right L5 2-level lumbar transforaminal epidural steroid injection. (Tr. 815-16.)

Plaintiff continued to treat with Dr. Rudman throughout 2007 and 2008. (Tr. 750-822.) During that time, she participated in physical therapy and pool therapy, and received several injections which generally improved her symptoms. (Tr. 791, 798, 801, 807-18.) On January 9, 2007, Plaintiff stated her right leg symptoms had improved for one (1) week following a transforaminal injection. (Tr. 822.) Dr. Rudman added Cymbalta to Plaintiff's medication regimen and continued physical therapy. (Tr. 823.) On March 16, 2007, Plaintiff stated she had some improvement following a sacroiliac ("SI") joint injection. (Tr. 818.) She also reported improvement with Cymbalta. (*Id.*) After a follow-up examination, Dr. Rudman diagnosed lumbar radiculitis and neuritis, and right sacroiliitis, and continued Plaintiff on Cymbalta. (*Id.*) On April 3, 2007, Dr. Rudman administered a paravertebral injection at the L5 level. (Tr. 812-13.)

D.   **Review of Disability Reports**

   i.   **Dr. Rudman**

On November 17, 2011, Dr. Rudman completed a multiple impairment questionnaire for Plaintiff. (Tr. 593.) Dr. Rudman described treating Plaintiff "monthly-quarterly" since November

10

2006 and estimated Plaintiff could sit less than twenty (20) minutes and stand and/or walk up to one (1) hour in an eight (8) hour workday, but had to change positions "very often" or "every 10-15 minutes." (Tr. 593, 595.) Dr. Rudman also estimated Plaintiff could lift and carry up to ten (10) pounds occasionally, and opined she had "significant limitations in doing repetitive, reaching, handling, fingering [and] lifting" as well as moderate limitations (i.e., "significantly limited but not completely precluded") using her upper extremities. (Tr. 596-97.) Dr. Rudman indicated that Plaintiff's symptoms would increase if she were placed in a competitive work environment, as Plaintiff could not keep her neck in a constant position and her pain constantly interfered with concentration and attention, although he noted Plaintiff could tolerate moderate stress. (Tr. 597-98.) Dr. Rudman concluded that Plaintiff's impairments rendered her totally disabled beginning in October 2006.[3] Thereafter, on February 14, 2013, Dr. Rudman wrote a letter "To Whom It May Concern" describing Plaintiff's treatment history and opining that Plaintiff had been permanently disabled "since her initial presentation in 2000." (Tr. 750-51.)

### ii.     Dr. Alexianu

Marie Alexianu, M.D., completed a neuromuscular disorders impairment questionnaire for Plaintiff on January 10, 2012. (Tr. 601.) Dr. Alexianu described treating Plaintiff "about every 2-3 months" since her first treatment on September 17, 2010, and most recently on September 26, 2011. (*Id*.) Dr. Alexianu opined that Plaintiff could sit and stand/walk for less than one (1) hour in an eight (8) hour workday, having to change positions every ten (10) to fifteen (15) minutes, and was unable to lift or carry any weight. (Tr. 603-04.) Dr. Alexianu further opined that Plaintiff had

---

[3] Both the questionnaire and relevant medical records indicate Plaintiff began treating with Dr. Rudman in November 2006. Nevertheless, Dr. Rudman states "the earliest date that the description of symptoms and limitations in this questionnaire applies" is "my first [appointment] 10/06". (Tr. 599.)

marked limitations (i.e., she was "essentially precluded" from) reaching, fingering and handling, could not perform postural maneuvers, and should avoid wetness, noise, fumes, gases, temperature extremes, humidity, dust, and heights. (Tr. 607.) Dr. Alexianu opined Plaintiff's symptoms and limitations began in "2000." (*Id.*)

### E.    Review of Disability Determinations
#### i.    State Agency Physicians (Drs. Rizwan and Golish)

On May 4, 2012, Mohammed Rizwan, M.D., a state agency physician, reviewed the medical evidence in connection with Plaintiff's DIB Application. (Tr. 53-56.) Dr. Rizwan opined that Plaintiff had a severe spine disorder, but found "[t]here is insufficient evidence to evaluate the claim." (Tr. 54-55.) Based on his review of the medical evidence, Dr. Rizwan determined Plaintiff was "not disabled." (Tr. 55.)

In connection with Plaintiff's request for reconsideration, on August 24, 2012, a second state agency physician, Melvin Golish, M.D., reviewed Plaintiff's medical history, which included updated medical evidence from the relevant period. (Tr. 58-67.) Based on his review, Dr. Golish opined Plaintiff retained the capacity to perform the full range of light work and concluded she was "not disabled." (Tr. 64-66.)

### F.    Review of Testimonial Record
#### 1.    Plaintiff's Testimony

At the October 29, 2013 hearing before the ALJ, Plaintiff testified she stopped working as an executive director for Verizon in 1999 "because [she] was having medical problems and could not keep up [her] job." (Tr. 30.) In 2003, Plaintiff attempted to return to work as a consultant, but was unable to "make any kind of work commitments" because she was not "able to keep up that kind of work sitting at a computer." (Tr. 31-33.) Plaintiff was also employed part-time at a travel

agency in 2010, but only "did it for six months, [and] with a lot of pain" so she had to stop. (Tr. 33.)

Plaintiff described a history of "acute" low back and hip pain, and spasms in her right thigh beginning in the early 2000s. (Tr. 36, 41-42.) She also described experiencing neck pain, eye twitching, and a facial tic, beginning in 2002. (Tr. 37.) Around that time, Plaintiff "noticed that [she] couldn't type or drive [or do] anything with [her] hands forward without" her hands going numb. (*Id.*) Plaintiff testified she "would have to stop doing whatever I'm doing especially computer, but now even chopping vegetables, talking on the phone . . . my ability to write, type, basically use my right arm, I would get interrupted after about 10/15 minutes of doing any one thing so I could not continue to do things with my right arm." (*Id.*) Plaintiff described experiencing a "shooting pain in [her] neck and then numbness down . . . into [her] hand." (Tr. 38.) As a result, Plaintiff testified she cannot reach or carry any weight, and is forced to rely on "other people". (Tr. 40-41.)

### G.     The ALJ's Findings

In a decision dated January 16, 2014, the ALJ determined Plaintiff met the insured status requirements of the Act, and would continue to meet them through December 31, 2006. (Tr. 14.) After reviewing the record and applying the relevant law, the ALJ found Plaintiff was not under a disability, within the meaning of the Act, from January 1, 2001 through the date last insured. (*Id.*) In reaching this conclusion, the ALJ applied the standard five-step evaluation process to determine if Plaintiff satisfied her burden of establishing disability.[4]

At step one, the ALJ determined (i) Plaintiff last met the insured status requirements of the Act on December 31, 2006, and (ii) Plaintiff did not engage in substantial gainful activity during

---

[4] *See* Part III, *infra*.

the period from her alleged onset date of January 1, 2001 through the date last insured of December 31, 2006. (Tr. 16.)

At step two, the ALJ determined Plaintiff's sciatica was a severe impairment "because it is a medically determinable impairment that significantly limits [her] mental and physical abilities to do one or more basic work activities." (Tr. 16.) The ALJ also noted Plaintiff's "impairment has lasted at a 'severe' level for a continuous period of more than 12 months." (*Id.*)

At step three, the ALJ determined that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments included in the Impairment List. (Tr. 16.) The ALJ explained, "[t]he medical evidence does not establish the requisite evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis as required under listing 1.04" of the Impairment List. (*Id.*) The ALJ further noted that "there is no evidence that [Plaintiff's] back disorder has resulted in an inability to ambulate effectively, as defined in 1.00(B)(2)(b)." (*Id.*)

At step four, the ALJ found that, through the date last insured, Plaintiff had the residual functional capacity ("RFC") to perform the full range of light work, as defined in 20 CFR 404.1567(b). (Tr. 17.) In determining Plaintiff's RFC, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as the opinion evidence in the record. (*Id.*) In considering Plaintiff's symptoms, the ALJ followed a two-step process. The ALJ first determined whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could reasonably be expected to produce Plaintiff's pain or other symptoms. (*Id.*) Second, finding an underlying physical or mental impairment(s) had been shown, the ALJ

evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit the claimant's functioning. (*Id.*) As the ALJ explained in his decision, "[f]or this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record." (*Id.*)

In his decision, the ALJ noted Plaintiff alleges disability due to a hip injury, hip pain, and dystonia. (Tr. 17 (citing Exhibit 1E).) The ALJ reviewed Plaintiff's function report(s), in which she reported spending her day washing, dressing, making the bed, doing computer work, feeding the dog, making phone calls, doing physical therapy, grocery shopping, cooking dinner, reading, watching TV, and helping her elderly mother. (*Id.* (citing Exhibit 5E).) He noted, however, Plaintiff "reported that she does [these] things slowly." (*Id.*) The ALJ's decision explains that, at the hearing, Plaintiff testified she worked at Verizon as an Executive Director until she took an early retirement buyout package in 2000. She also testified that her condition has progressively worsened. Specifically, Plaintiff testified she was, in fact, able to do routine tasks like laundry and housework prior to her date last insured, but she did so at a reduced level. Plaintiff testified she was able to drive, run errands, prepare meals for her sons, grocery shop, and otherwise function, but did all this with some pain and difficulty. Plaintiff also conceded her condition has severely worsened, to the point she now takes heavy pain medication that she was not taking in 2006. (*Id.*)

After considering the medical evidence and Plaintiff's testimony at the hearing, the ALJ found Plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity, persistence and

limiting effects of these symptoms are not entirely credible for the reasons explained in [his] decision." (Tr. 17.)

Specifically, in terms of Plaintiff's alleged disabling conditions, the ALJ found "the objective medical evidence fails to support [Plaintiff]'s allegations of complete disability." (Tr. 17.) The ALJ "note[d] that [Plaintiff]'s date last insured is December 31, 2006 and therefore she must establish a disabling condition prior to this date." (*Id*.) However, the ALJ found "[t]he record contains only minimal evidence prior to her date last insured of December 31, 2006." (*Id*.) The ALJ noted Plaintiff's testimony that she was receiving treatment prior to her date last insured through her HMO of Kaiser Permanente, and that "[t]he records from Kaiser Permanente do note that she received sciatic nerve blocks in 2003 and then facet joint injections for her lumbar spondylosis in May of 2006. She reported her pain was only 5/10." (Tr. 18 (citing Exhibit 1F).) The ALJ also discussed Dr. Rudman's treatment notes from November 2006, which "noted that [Plaintiff] had full but painful range of motion and nerve blocks were noted to provide minimal relief." (*Id*.) In addition, "[c]hiropractic care was noted to improve [Plaintiff's] walking and Prednisone was also noted to help. She reported her pain as 4-5/10." (*Id*. (citing Exhibits 18F, 21F and 23F).) Finally, the ALJ explained "X-rays and an MRI were performed on her lumbar spine in December of 2006 and revealed an intact lumbar spine with only minimal degenerative changes. No stenosis or herniations were found." (*Id*. (citing Exhibit 11F).)

Based on the evidence, the ALJ did not find Plaintiff's condition was totally disabling prior to her date last insured of December 2006. Rather, the ALJ found "[o]bjective imaging failed to confirm any more than minimal degenerative changes and [Plaintiff] testified that she was able to perform many activities of daily living, albeit at a slower pace and with some pain." (*Id*.) "As for the opinion evidence, although her treating physicians opined that her condition prohibited her

16

from performing even sedentary work, these assessments were all made well after [Plaintiff]'s date last insured of 2006." (*Id.*) Specifically, "Dr. Rudman opined that her condition was debilitating but he did not begin treating [Plaintiff] until November of 2006 and his notes at that time failed to show any limitations which would preclude the claimant from performing sedentary work. Likewise, the assessments by Drs. Shariati and Alexianu are also made in 2012 and 2013 are [sic] well after the claimant's date last insured." (*Id.* (citing Exhibit 9F).) Accordingly, the ALJ "afford[ed] these assessments no weight." (*Id.*) Rather, the ALJ found that, "[a]lthough [Plaintiff]'s condition may have progressed, there is no evidence prior to December of 2006 to support an assessment that she cannot perform light work." (*Id.*) In reaching this conclusion, the ALJ specifically "note[d] that the State agency physicians opined that [Plaintiff] was capable of performing light work and [the ALJ] concur[ed] with their findings." (*Id.* (citing Exhibits 2A and 4A).)

## II.    STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed,

"substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently

engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140.

Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains

the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at

141. If the claimant is able to perform previous work, the claimant is determined to not be disabled.

20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden

of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428.

Finally, if it is determined the claimant is no longer able to perform his or her previous

work, the burden of production then shifts to the Commissioner to show, at step five, that the

"claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47

n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual

functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ

must analyze the cumulative effect of all the claimant's impairments in determining whether the

claimant is capable of performing work and not disabled. *Id.*

## III.   DECISION

Plaintiff raises two arguments on appeal. First, Plaintiff argues the ALJ erred in his decision

by failing to properly weigh the medical opinion evidence. (*See* ECF No. 12 at 24.) Second,

Plaintiff argues the ALJ failed to properly evaluate Plaintiff's credibility. (*Id.* at 31.) The Court

will address both arguments in turn.

### A.  Whether the ALJ Failed to Properly Weigh the Medical Opinion Evidence

In making a disability determination, the ALJ must consider all evidence before him. *See*

*e.g. Plummer*, 186 F.3d at 433; *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986). Although the ALJ

may weigh the credibility of the evidence, he must give some indication of the evidence which he

rejects and his reasons for discounting such evidence. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220

F.3d 112, 121 (3d Cir. 2000); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). In *Burnett*, the

Third Circuit held that the ALJ had not properly decided an evidentiary issue because he "fail[ed]

to consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." *Burnett*, 220 F.3d at 121. "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. Consequently, an ALJ's failure to note if evidence that contradicts his findings was considered, or to explain why such information was not credited, are grounds for a remand. *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 435 (3d Cir. 1999). However, this rule does not require an ALJ to explicitly discuss every piece of relevant evidence in his decision. *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). For example, an ALJ may be entitled to overlook evidence that is neither pertinent, relevant, nor particularly probative. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008); *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).

Additionally, when the record presents inconsistencies with a physician's ultimate opinion or where the physician's notes actually undermine his own opinion, an ALJ may appropriately discount the physician's opinion. *See Burke v. Comm'r of Social Security*, 317 F. App'x 240, 243-44 (3d Cir. 2009). Although the ALJ must not "reject evidence for no reason or for the wrong reason, [he] may choose whom to credit when considering conflicting evidence." *Kerdman v. Comm'r of Soc. Sec.*, 607 F. App'x 141, 144 (3d Cir. 2015) (quotations omitted). A reviewing court "may not re-weigh the evidence." *Id.* Thus, even if there is contrary evidence in the record that would justify the opposite conclusion, the ALJ's decision will be upheld if it is supported by substantial evidence. *See Simmonds*, 807 F.2d at 58.

In his decision, the ALJ afforded "no weight" to the assessments of Drs. Rudman, Shariati and Alexianu because "these assessments were all made well after the [Plaintiff]'s date last insured of 2006. (Tr. 18.) In reaching this determination, the Court finds the ALJ provided reasonable

justifications to discount these opinions. Specifically, the ALJ noted that, although "Dr. Rudman opined that her condition was debilitating[,] he did not begin treating [Plaintiff] until November of 2006 and his notes at that time failed to show any limitations which would preclude [Plaintiff] from performing sedentary work." (Tr. 18 (citing Exhibit 9F).) Similarly, the ALJ found "the assessments by Drs. Shariati and Alexianu are also made in 2012 and 2013[,] well after [Plaintiff]'s date last insured." (*Id*.) After noting "there is no evidence prior to December of 2006 to support an assessment that [Plaintiff] cannot perform light work," the ALJ "afford[ed] these assessments no weight." (*Id*.) As the ALJ explained, "the State agency physicians opined that [Plaintiff] was capable of performing light work and [he] concur[ed] with their findings." (*Id*. (citing Exhibits 2A and 4A).)

Nevertheless, Plaintiff argues "the ALJ erred by finding the opinions from the treating specialists were not entitled to any probative weight because they are retrospective in nature." (ECF No. 12 at 26.) Plaintiff further contends the opinions from Drs. Rudman and Alexianu are consistent with evidence that pre-dates Plaintiff's date last insured and the ALJ made "no more than a conclusory finding that the[se] opinions . . . are inconsistent with unspecified findings in the treatment notes from prior to the date last insured." (*Id*. at 27 (citing Tr. 18).) According to Plaintiff, "[t]his requires remand as in order to reject a treating source's opinion entirely, the ALJ must base his rejection on contradictory medical evidence, and 'not due to his or her own credibility judgments, speculation or lay opinion.'" (*Id*. (citing *Morales*, 225 F.3d at 317-18).) Essentially, Plaintiff argues the opinions from Drs. Rudman and Alexianu are based on appropriate clinical and diagnostic testing, are uncontradicted by other substantial evidence in the record, and should have been given controlling weight. (*Id*. at 30.) Finally, Plaintiff argues that, even if the ALJ did not err by refusing to give controlling weight to the opinions from the treating specialists,

the "ALJ failed to comprehensively consider any of the factors enumerated in the Regulations . . . before assigning the treating source opinions no weight." (*Id*. at 31.)

In opposition, the Commissioner argues the ALJ appropriately afforded no weight to the extreme opinions rendered by Drs. Rudman and Alexianu more than four (4) years after the relevant period. (ECF No. 13 at 12-13.) With respect to Dr. Rudman's November 2011 opinion, the Commissioner argues "it was made well after Plaintiff's insured status expired and [his] treatment of Plaintiff prior to her date last insured does not include significant objective findings that would support a conclusion that Plaintiff had a physical impairment as of December 31, 2006." (*Id*. at 13 (citing Tr. 18).) The Commissioner also contends "the ALJ appropriately found Dr. Alexianu's extreme opinion unpersuasive because it was rendered in 2012, more than five years after Plaintiff's date last insured" and, "as the ALJ noted, there is no evidence prior to December 31, 2006 to support an assessment that [Plaintiff] cannot perform light work. (*Id*. at 14.) In short, the Commissioner argues "the medical evidence demonstrated that Plaintiff was not as limited as suggested by Dr. Rudman and Dr. Alexianu" and "the ALJ sufficiently articulated his reasoning based on the substantial evidence contained in the record." (*Id*. at 15-16.) The Court agrees.

"Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records, '[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity.'" *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011)). As such, the ALJ is authorized to give minimal weight to treating physician opinions that are internally inconsistent or inconsistent with other evidence in the record, as well as opinions that are conclusory or unsupported by medical evidence. 20 C.F.R. § 404.1527(c)(2); *see Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). In determining the appropriate weight to give a treating

physician's opinion, an ALJ weighs the opinion against several factors, including treatment relationship, the doctor's specialty, the consistency of the opinion with the record as a whole, and the decree to which an opinion is supported by relevant evidence. 20 C.F.R. §§ 404.1527(c)(2)-(4) and (d). Because the ALJ need not undertake an exhaustive discussion of the record, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000), as long as the ALJ articulates his reasoning and bases it in the evidence, a written analysis of every piece of evidence in the record is not required. *Phillips v. Barnhart*, 91 F. App'x 775, 779 n.7 (3d Cir. 2004). The ALJ did so here and, accordingly, the Court defers to the ALJ's decision to afford "no weight" to the opinions of Drs. Rudman and Alexianu.

Specifically, the ALJ explained Dr. Rudman's November 2011 opinion was made well after Plaintiff's insured status expired and he did not even begin treating Plaintiff until November 2006, one (1) month prior to her date last insured. *See* 20 C.F.R. § 404.1527(c)(2)(i) (identifying length of treatment relationship and frequency of examination as relevant factors when weighing opinion evidence). In his decision, the ALJ found Dr. Rudman's notes from November and December 2006 failed to show any limitations which would preclude Plaintiff from performing light work. (Tr. 18.) Specifically, Dr. Rudman's treatment records show Plaintiff rated her pain as mild-to-moderate, and had normal gait, full strength throughout, no neurological abnormalities, and full painless range of motion in her lower extremities. (Tr. 826-27, 831.) Likewise, a repeat lumbar MRI from December 2006 showed only minimal degenerative changes. (Tr. 629-30.) The ALJ was within his discretion to determine these findings do no support Dr. Rudman's subsequent November 2011 opinion that Plaintiff's physical impairments would have rendered her unable to

work as of December 31, 2006.[5] *See Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990) (holding

that, in order to be entitled to DIB, a claimant must show she was disabled prior to the date on

which her insured status expired); 20 C.F.R. § 404.1527(c)(3) (providing for greater weight where

an opinion is supported by relevant evidence such as medical signs and laboratory findings).

The ALJ also found Dr. Alexianu's opinion unpersuasive, in part, because it was rendered

in 2012, more than five (5) years after Plaintiff's date last insured, and because Dr. Alexianu did

not begin treating plaintiff until September 2012, nearly four (4) years after the relevant period.

As the ALJ noted, there was no evidence prior to December 31, 2006 to support Dr. Alexianu's

opinion that Plaintiff cannot perform light work. *See* 20 C.F.R. § 404.1527(c)(4) (directing the

ALJ to give more weight to an opinion, the more consistent it is with the record as a whole). Here,

the ALJ reviewed the treatment notes from Kaiser Permanente, over a five (5) year period from

2001 to 2006, and found they demonstrated Plaintiff generally had normal gait, negative straight

leg raising, full strength throughout, and no neurological abnormalities, and continued to report

partial relief of symptoms with treatment. (*See* Tr. 225, 233, 256, 259, 296, 314, 373, 427, 430,

433, 437-38, 464.) The ALJ also noted diagnostic testing failed to produce objective findings to

support Dr. Alexianu's assessment. The Court finds the ALJ had sufficient basis, and sufficiently

explained his decision, to afford no weight to these opinions. *See, e.g., Welch v. Heckler*, 808 F.2d

264, 270 (3d Cir. 1986) (explaining that a claimant need not be pain-free or experiencing no

discomfort to be found not disabled).

---

[5] The ALJ was also within his discretion to find Dr. Rudman's treatment notes from 2007 and 2008
do not document that her impairment significantly worsened. (*See* Tr. 750-822.) To the contrary,
even after Plaintiff's insured status expired, throughout 2007 and 2008, she continued to report
increased activity and had unremarkable physical examinations. (*Id.* at 791, 809-10, 817-18.)

Likewise, the Court finds the ALJ was not bound to accept the opinions of Plaintiff's treating physicians and was within his discretion to assign significant weight to the state agency physicians' opinions. *See Chandler v. Comm. of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (holding "the opinion of a treating physician does not bind the ALJ on the issue of functional capacity" and "State agent opinions merit significant consideration as well").

In sum, the Court finds the ALJ sufficiently explained his reasons for giving "no weight" to the opinions of Drs. Rudman and Alexianu, and his decision to do so is supported by substantial evidence. *See* 20 C.F.R. § 404.1527(f)(2)(ii); *Rutherford v. Barnh*art, 399 F.3d 546, 557 (3d Cir. 2005). The ALJ's decision detailed Plaintiff's medical history and the opinions of both Plaintiff's treating physicians and the state agency physicians. The ALJ explained that he gave "no weight" to the opinions of Drs. Rudman, Shariati and Alexianu because they were all made well after Plaintiff's date last insured of 2006, and "there is no evidence prior to December of 2006 to support an assessment that she cannot perform light work." (Tr. 18) In doing so, the ALJ clearly considered and evaluated the opinions of Plaintiff's treating physicians even though they purported to make the ultimate disability determination, which is reserved to the Commissioner. The ALJ properly evaluated the opinions of Plaintiff's treating physicians and had substantial evidence to "afford these assessments no weight" and instead rely on the opinions of the State agency physicians that Plaintiff was capable of performing light work. *Williams v. Sullivan*, 970 F.2d 1178, 1185 (3d Cir. 1992).

### B.  Whether the ALJ Failed to Properly Evaluate Plaintiff's Credibility

It is the ALJ's responsibility "to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). A claimant's "allegations of subjective symptoms must be supported by objective medical evidence." *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 618 (3d Cir. 2009) (citing 20 C.F.R. § 404.1529(b)). Here, the ALJ evaluated the record, analyzed the credibility of Plaintiff's subjective allegations of pain and weakness in light of the entire record, and proffered reasonable justifications for his findings on credibility.

However, Plaintiff contends the ALJ erred because he "failed to give appropriate consideration to the record as a whole before finding [Plaintiff]'s allegations were 'not entirely credible.'" (ECF No. 12 at 33.) Plaintiff argues "the ALJ cannot substitute his own interpretation of the medical findings for the medical experts" and improperly made a credibility determination based solely on the basis of objective medical evidence. (*Id.*) Plaintiff contends the "ALJ cited no authority that her level of care conflicts with her statements about her conditions." (*Id.* at 33-34 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).) According to Plaintiff, "the Third Circuit has downplayed the significance of minimal daily activities as evidence that can refute credible medical evidence of disability" and, thus, the ALJ should not have found Plaintiff's allegations inconsistent with evidence that she can perform some, unspecified activities of daily living. (*Id.* at 34 (citing *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988).) Plaintiff contends "[t]here is no evidence in the present record that [Plaintiff] ever engaged in significant daily activities that contradict any of her statements regarding her limitations." (*Id.*) Finally, Plaintiff argues her "honorable work history with sustained earnings every year for over 20 years

prior to her disability" compels a finding that she is entitled to "substantial credibility." (*Id.* at 34-35 (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979).)

In response, the Commissioner argues the ALJ's credibility assessment is supported by substantial evidence and he followed the appropriate two-step process to arrive at his decision. The Commissioner argues the ALJ correctly found the objective medical evidence failed to support Plaintiff's allegations of complete disability prior to December 31, 2006 and the ALJ's credibility determination should be entitled to great deference. Once again, the Court agrees.

It is the ALJ's responsibility "to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). Thus, "[i]n addition to objective medical facts and expert medical opinions, the [ALJ] must consider the claimant's subjective evidence of pain and disability, as corroborated by family and neighbors; and all of these factors must be viewed against the applicant's age, educational background and work experience." *Reefer v. Barnhart*, 326 F.3d 376, 381 (3d Cir. 2003) (quoting *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974)). A claimant's "allegations of subjective symptoms must be supported by objective medical evidence." *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 618 (3d Cir. 2009) (citing 20 C.F.R. § 404.1529(b)). As such, "the ALJ may reject [subjective complaints of pain] when they are inconsistent with objective medical evidence in the record." *Morel v. Colvin*, Civ. No. 14-2934 (ES), 2016 U.S. Dist. LEXIS 44347, at *11 (D.N.J. Apr. 1, 2016) (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)).

Courts will "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor." *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). "The substantial evidence standard entitles an ALJ to considerable deference,

especially in credibility findings." *Volage v. Astrue*, No. 11-cv-4413, 2012 WL 4742373, at *7 (D.N.J. Oct. 1, 2012). "An ALJ is required to consider the claimant's subjective complaints, but may reject these complaints when they are inconsistent with the objective medical evidence, claimant's own testimony, or other evidence in the record." *Id.*; *see also Thomas v. Astrue*, No. 10-cv-6205, 2012 WL 1067690, at *4-*5 (D.N.J. Mar. 29, 2012).

Here, substantial evidence supports the ALJ's credibility determination. In arriving at his determination, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. (Tr. 17.) Specifically, the ALJ found the objective medical evidence failed to support Plaintiff's allegations of complete disability prior to December 31, 2006, explaining the record contains minimal evidence prior to her date last insured and noting the treatment Plaintiff received was routine, consisting of NSAID medication, physical therapy and home exercise programs, and injections. *See* 20 C.F.R. § 404.1529(c)(3)(iv)-(vi) (treatment history is an important indicator about the intensity and persistence of a claimant's symptoms). The ALJ was within his discretion to find Plaintiff's treatment record prior to her date last insured belies Plaintiff's allegations that her symptoms prevented her from working.

The ALJ was also within his discretion to find Plaintiff's subjective complaints not credible because she continued to carry out a wide range of daily activities, albeit with some difficulty. 20 C.F.R. § 404.1529(c)(3)(i) (stating that the Commissioner will consider a claimant's daily activities when assessing credibility). As the ALJ noted in his decision, Plaintiff testified that, prior to her date last insured, she remained able to perform a wide range of routine tasks, and had previously reported, in an April 18, 2012 Function Report-Adult, spending her days actually performing routine tasks such as: laundry and housework; driving an automobile; running errands;

preparing meals; grocery shopping; performing laundry and household chores; working on the computer; caring for her pets; and doing physical therapy. (Tr. 17-18, 38-50, 169-73.)

Finally, while an ALJ may afford a claimant "substantial credibility" due to a lengthy work history, *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979), contrary to Plaintiff's contention, "work history alone is not dispositive" of credibility. *Sanborn v. Colvin*, No. 13-cv-224, 2014 WL 3900878, at *1 n.1 (E.D.Pa. Aug. 11, 2014), *aff'd*, 2015 WL 3452872 (3d Cir. June 1, 2015) (citation omitted). Indeed, the Third Circuit has held "an ALJ is not required to equate a long work history with enhanced credibility." *Sanborn*, 2015 WL 3452872, at *3 (citing *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001)). Here, the ALJ properly considered Plaintiff's work history as one of many factors in determining Plaintiff's credibility and, ultimately found that it did not outweigh the other factors he reviewed. *Newcomer v. Comm's of Social Sec.*, 2015 WL 1780205 (W.D.Pa. Apr. 20, 2015) (affirming ALJ's credibility determination where the ALJ acknowledged claimant's work history). The ALJ's finding that Plaintiff's statements were not entirely credible is supported by the medical and non-medical evidence in the record, and the ALJ properly restricted Plaintiff to a full range of light work. *See* SSR 96-8p, 1996 WL 374184, at *1 ("The [RFC] assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms."); *Welch*, 808 F.2d at 270 (stating that an individual is not required to be without pain or discomfort to be found not disabled).

In sum, the ALJ properly weighed and evaluated the medical and opinion evidence in the record and his decision is supported by substantial evidence. This Court declines to re-weigh that evidence. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986) (holding, on

appeal, a district court cannot re-weight the evidence but must affirm if the Commissioner's decision is supported by substantial evidence). Accordingly, the ALJ's decision is affirmed.

## IV.      CONCLUSION

For the reasons set forth above, the ALJ's decision is **AFFIRMED**. An appropriate Order will follow.


Date: **January 25, 2017**                           */s/ Brian R. Martinotti*
                                                      **HON. BRIAN R. MARTINOTTI**
                                                      **UNITED STATES DISTRICT JUDGE**